**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA**

| | | |
|---|---|---|
| CASH PROCESSING SERVICES | ) | 3:04-cv-0490-ECR-RAM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| AMBIENT ENTERTAINMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

    Plaintiff Cash Processing Services (hereinafter "Plaintiff" or "CPS") initiated this action on September 10, 2004, by filing a complaint (#2) against Defendant Ambient Entertainment, Inc. (hereinafter "Defendant" or "Ambient"), alleging infringement of the "Mustang Ranch" trademark.  Ambient filed a motion for summary judgment (#23) on May 26, 2005, claiming that the Government had abandoned the mark and seeking judgment in its favor and dismissal of the complaint (#2).  Plaintiff opposed (#28) the motion (#23) on June 20, 2005, and noted that discovery had not yet been completed. Ambient replied (#32) to Plaintiff's opposition on July 11, 2005.

    The motion being ripe, we address it herein.  For the reasons stated below, Defendant's motion (#23) will be **DENIED**.

## I.   FACTUAL HISTORY

From 1971 until approximately 1990, Joseph and Sally Conforte owned and operated the Mustang Ranch as a legal brothel in Storey County, Nevada. (Pl.'s Opp. (#28), Ex. 1 & 3.)  When the Confortes filed for bankruptcy in 1990, the property was purchased at auction by Mustang Properties, Inc. (Id. at Ex. 3.)  Mustang Properties then sold the property to AGE Corporation, Inc., and AGE Enterprises, Inc., two corporations associated with the Confortes, which operated the Mustang Ranch as a brothel and sold goods associated with the mark between 1990 and 1999. (Id., Def's Mot. (#23) at 3.)

In 1999, AGE Enterprises and AGE Corporation were convicted of racketeering. (Pl.'s Opp. (#28), Ex. 3.)  On August 9, 1999, the Government seized the brothels.[1]  (Def's Mot. (#23) at 3.)  On July 12, 1999, a Preliminary Order of Forfeiture granted the Government twenty million dollars, all the stock, interests in and assets of the accounts receivable and real property owned by AGE Corporation and AGE Enterprises. (Pl.'s Opp. (#28), Ex. 4.)  On March 9, 2001, after the disposition of all notices of interest, the Final Order of Forfeiture was entered granting the United States Government title to the property. (Id., Ex. 5.)  The Final Order was immediately stayed pending appeal to the Ninth Circuit Court of

---

[1] Various governmental entities have maintained control over the Mustang Ranch at various times during the period examined here, including the IRS and the Bureau of Land Management ("BLM"). Both the IRS and the BLM are subsumed under our use of the term "the Government. Thus, our use of the term "the Government" may refer to one or both entities, depending on the context and specific time period to which we are referring.

2

Appeals. (Id., Ex. 6.)  The Court of Appeals affirmed the convictions on June 29, 2001, United States v. AGE Enterprises, Inc., 15 Fed. Appx. 439 (9th Cir. 2001), and the Supreme Court denied certiorari on April 29, 2002, United States v. Colletti, 535 U.S. 1035 (2002).

From 1999 until some point in 2003, the Government was publicly examining its options for the property and considering the potential for maximizing financial, political, and environmental benefits.  (See Pl.'s Opp. (#28) at 5, Brandt Depo. at 62-65; Id., Struble Depo. at 42, 90-91; Id., Brandt Decl., Ex. A.)  According to newspaper articles cited by Ambient, the Government had no intention to operate the Mustang Ranch as a brothel, but rather, was "thinking about reopening the Mustang Ranch . . . as a tourist attraction and research center for wild horses."[2]  (Def.'s Mot. (#23) at 4.)  However, in their depositions, Government Attorney Alf Brandt and Public Affairs Officer Mark Struble maintained that while the Government did not have the "expertise" itself to be operating a brothel, and would probably be using the land for other purposes, it was considering options of selling or licensing the Mustang Ranch buildings and trademark to a third party, who potentially could use those assets to operate a brothel.  (See Pl.'s Opp. (#28), Brandt Depo. at 89, 161; Id., Struble Depo. at 47-49.)  The IRS transferred the Mustang Ranch property to the Bureau of Land Management ("BLM") in February of 2003.  (Id., Brandt Decl., Ex. A.)  The transfer agreement prohibited the use of

---

[2] Our treatment of newspaper articles as hearsay will be discussed below.

1  the Mustang Ranch property as a brothel.  (Id. at 4.)  The BLM
2  ultimately determined that there should be no structures on the
3  significant portion of the land which was located in a flood plain
4  and decided to have the structures removed, possibly by selling
5  them to someone who would remove them and use them elsewhere.
6  (Id., Struble Depo. at 48; Id., Brandt Depo. at 161.)
7       The Government auctioned off items of personal property, many
8  of them bearing the Mustang Ranch mark, on December 14, 2002.
9  (Def.'s Mot. (#23), Ex. J.)  According to Alf Brandt, the
10 Government continued to auction off personal items on eBay, an
11 online auction service, from March through July or August of 2003.
12 (Pl.'s Opp. (#28), Brandt Depo. at 43.)  The BLM made its first
13 attempt to auction the Mustang Ranch buildings on eBay in June of
14 2003. (Def.'s Mot. (#23), Ex. W.)  The first auction attempt, which
15 purported to sell "the World Famous Mustang Ranch . . . in its
16 entirety," but which did not specifically mention the trademark,
17 failed to meet the Government's minimum bid.  (Id.)  The Government
18 then conducted a second eBay auction in October of 2003, this time
19 for the buildings and the "World Famous Mustang Ranch trademark."
20 (Id., Ex. X.)  Lance Gilman was the high bidder on the Mustang I
21 building and the Mustang Ranch trademark, which he purchased for
22 $145,100 on October 16, 2003. (Pl.'s Opp. (#28), Brandt Decl. at 3;
23 Id., Gilman Decl. at 3.)  Gilman apparently acquired the mark on
24 behalf of Cash Administration Services, which later assigned all
25 interest in the mark to TG Investments, which in turned assigned
26 the rights to Plaintiff CPS.  (Id., Brandt Decl. at 3; Id., Gilman
27 Decl. at 3-4, Ex. P.)
28

4

In the meantime, between August 13, 2001, and May 14, 2004, Ambient filed six trademark applications with the US Patent and Trademark Office for the Mustang Ranch trademark in conjunction with numerous commercial goods. (Pl.'s Opp. (#28), Ex. 10.) On September 24, 2003, the Government received a letter from Ambient's attorney, asserting claims to the Mustang Ranch trademark. (Id., Brandt Decl. at ¶ 8.) The Government responded to the letter on October 3, 2003, asserting that its rights in the mark were not abandoned and that Ambient was infringing on its mark. (Id., Brandt Decl., Ex. F.)

**II. DISCUSSION**

**A. Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists. Nw. Motorcycle Ass'n v. U.S. Dep't. of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom "in the light most favorable to the nonmoving party," Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. Fed. R. Civ. P. 50(a).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the

5

absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the parties may submit evidence in an inadmissible form-- namely, depositions, admissions, interrogatory answers, and affidavits--only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c); Beyene v. Coleman Security Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. Anderson, 477 U.S. at 248. Summary Judgment is not proper if material factual issues exist for trial. B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered. Id. Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to

6

judgment as a matter of law. Celotex, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. Id.

**B.  Abandonment**

The Lanham Act provides:

> A mark shall be deemed to be "abandoned" . . . :
>
>> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127. "Abandonment of a trademark, being in the nature of a forfeiture, must be strictly proved." Prudential Ins. Co. of America v. Gibralter Fin. Corp. of Cal., 694 F.2d 1150, 1156 (9th Cir. 1982).

If the party alleging abandonment establishes a three-year period of non-use, then the burden shifts to the other party to rebut the presumption by presenting evidence of actual use, intent to resume use "in the reasonably foreseeable future," or valid reasons for nonuse. Emergency One, Inc. v. Am. FireEagle Ltd., 228 F.3d 531, 535-37 (4th Cir. 2000); Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396 (9th Cir. 1985).[3] Determining

---

[3] Star-Kist described the requisite intent as "lack of intent to abandon." 769 F.2d at 1396. However, most recent cases describe the requisite intent as "intent not to resume use," which more closely tracks the language of section 1127. McCarthy on Trademarks and Unfair Competition, § 17:11 (4th Ed.); see also Silverman v. CBS Inc.,

7

intent or valid reasons for nonuse requires a factual determination. See Star-Kist Foods, 769 F.2d at 1396. The Second Circuit found the presumption to be rebutted where New York stopped operating a water business due to a legislative decision, and where the state had sought continuously thereafter to sell the business with its goodwill and trademark. Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2nd Cir. 1980).

Once the defending party's burden of production is satisfied, "any presumption deriving from the proof of the prima facie case drop[s] out, and [the challenging party] [i]s obligated to prove both discontinued use and intent not to resume use." Emergency One, 228 F.3d at 536. Although the Fourth Circuit in Emergency One and the Federal Circuit have adopted a "preponderance of the evidence" standard for proving "intent not to resume," the Ninth Circuit joins the majority of courts following the standard that abandonment must be strictly proved. McCarthy on Trademarks and Unfair Competition, § 17:12 (4th Ed.); Prudential Ins., 694 F.2d at 1156. While the Ninth Circuit has not defined "strictly proved" further, the majority of courts applying that standard have found that evidence of abandonment must be clear and convincing. See e.g. EH Yacht LLC v. Egg Harbor, LLC, 84 F. Supp. 2d 556, 564

---

870 F.2d 40, 46 (2nd Cir. 1989) (discussing congressional history wherein proposed language of section 1127 was changed from "intent to abandon" to "intent not to resume"); see also Unuson Corp. v. Built Entertainment Group, Inc., 2006 WL 194052, at 6 (N.D. Cal. 2006) (adopting "intent to use" standard over "intent not to abandon" as every contested abandonment case presents an intent not to abandon) (citing Imperial Tobacco Ltd. v. Philip, 899 F.2d 1575, 1581 (Fed. Cir. 1990). We find that the "intent to resume use" standard most directly supports the purposes of section 1127.

1  (D.N.J. 2000) (citing McCarthy at § 17:12); Dial-A-Mattress
2  Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1355
3  (E.D. NY 1994).
4       When the alleged period of nonuse is less than three years, no
5  presumption attaches and the challenging party has the same burden
6  as would a party for which a prima facie case had been rebutted:
7  clear and convincing evidence of nonuse and intent not to resume
8  use in the reasonably foreseeable future. Chere Amie, Inc. v.
9  Windstar Apparel, Corp., 191 F. Supp. 2d 343, 349 (S.D.N.Y., 2001)
10 (citing Stetson v. Howard D. Wolf & Assocs., 955 F.2d 847, 850 (2nd
11 Cir. 1992)).
12      The kind of "use" that a party must demonstrate under section
13 1127 is "the bona fide use of such mark made in the ordinary course
14 of trade, and not made merely to reserve a right in a mark." 15
15 U.S.C. § 1127. "Thus, neither promotional use of the mark on goods
16 in a different course of trade nor mere token use constitute 'use'
17 under the Lanham Act." Emergency One, 228 F.3d at 536.
18      The parties dispute whether CPS or its predecessors in
19 interest did not use the mark for a period of at least three years.
20 Ambient claims that neither the Government nor CPS used the mark at
21 all from the time the Government seized the property in August of
22 1999 until the initiation of this lawsuit. CPS claims that the
23 Government used the mark at the auctions of personal items
24 beginning in December of 2002 and that CPS used the mark through
25 advertisements and "Coming Soon" signs, starting as early as
26 October of 2003.

9

1        We find that a few auctions, wherein goods other than brothel
2   services were sold, falls under the category of promotional or
3   token use, and thus the 2002 auction does not toll the period of
4   nonuse.  See Emergency One, 228 F.3d at 536.  In addition, we find
5   that the Government's mailing cease and desist letters was merely
6   an effort to reserve a right in the mark, and does not constitute
7   bona fide use under section 1127.  However, CPS's use of the mark
8   in advertising the brothel which it fully expected to be opening
9   shortly does constitute use of the mark under the statute.  Thus,
10  we find that the period of nonuse of the Mustang Ranch spans from
11  the time of seizure in August 1999 until October of 2003.  Because
12  that period constitutes more than 3 years, the burden of production
13  shifts to CPS to present evidence of valid reasons for nonuse or
14  intent to resume use.
15       First, we adopt Judge Hagan's finding in an order in a related
16  action that the Government's lack of control over the assets during
17  the period of time between the Preliminary Order of Forfeiture,
18  August 1999, and the Final Order of Forfeiture, June 29, 2001,
19  presents a valid reason for nonuse during that period.  In
20  addition, much like the state of New York in Saratoga, the United
21  States Government has substantial political reasons for not using
22  the Mustang Ranch trademark to operate a brothel.  (See Brandt
23  Depo. at 162, noting intra-agency discussions regarding potential
24  political implications of Government running controversial
25  business.)  However, Ambient argues that unlike New York, the
26  Government did not continuously attempt to sell the mark with the
27  other business assets for the specific use, as the first eBay

10

auction attempt separated out the mark from the other assets. Nevertheless, we find that CPS has raised at least a genuine issue of material fact as to whether the Government assumed it was auctioning the mark along with the property at the first eBay auction.  The language of the auction website supports this inference as it claims to be selling the entire World Famous Mustang Ranch minus the land, and nowhere does it specifically exclude the mark.  In addition, while the two years between the Final Order of Forfeiture and the eBay auction may seem like a substantial period of nonuse for a private company, it is certainly plausible that it would take the multi-faceted political bureaucracy charged with control of the Mustang Ranch at least two years to assess its assets, engage the public in a discussion over use, divide the assets, and sell the brothel portions to an entity that could operate a brothel.  (See Brandt Depo. at 65, noting Government officials were "overwhelmed by the interests and the different opinions.")  Thus, we find that CPS has presented at least a genuine issue of material fact regarding valid reasons for nonuse during the period of nonuse.

   Because CPS has presented evidence of valid reasons for nonuse, it has rebutted the presumption of abandonment and Ambient must now prove by clear and convincing evidence that the Government intended not to resume use.[4]   At this point of the analysis, the

---

[4] CPS has probably also met its burden of production by offering evidence of intent to resume use.  However, because we have already found evidence of valid reasons for nonuse, we need not address its intent evidence for purposes of rebutting the presumption, and only address it in examining Ambient's evidence of the Government's alleged intent to not resume use.

11

uniqueness of our factual scenario becomes evident, because while it is undisputed that the holder of the mark in the period at question did not itself intend to use the mark, CPS argues that the Government did intend to sell the mark to an entity that could use the mark for brothel services in the reasonable future.  In determining whether the test for abandonment applies to intent for a third party to use the mark, we find guidance in the analysis engaged in by the District of New Jersey in considering the disposition of a mark in bankruptcy proceedings.  That court applied canons of statutory construction to section 1127 in finding that

> [Congress's use] of the term "deemed"–a term that suggests an objective finding of abandonment by a factfinder-shows Congress's intent that a determination of intent not to resume use should be based on the totality of objective evidence of intent to resume use, not simply the intent of the registered trademark owner.  Under this standard, so long as there is power to do so, *any* valid intent to resume use within a reasonable time becomes relevant.

EH Yacht LLC v. Egg Harbor, LLC, 84 F. Supp. 2d 556, 566 (D.N.J. 2000).  The EH Yacht court then "examine[d] the record for objective indicia of intent not to resume use and for evidence of loss of goodwill."  Id.  Much like the case at bar, the challenging party in EH Yacht had offered evidence that some of the company's principals had expressed an intent to not resume use of the mark in question.  Id. at 567.  In addition, the other party had offered evidence that some of the principals had "assumed operations would be re-started under new management."  Id.  Rejecting a "snap-shot approach," and noting the "confusion surrounding the suspension of operations," the EH Yacht court found that "the open question [as

12

to] whether the company's principals intended to reorganize the business, sell the business to another concern, or simply allow its creditors to seize its assets and operate the business as a going concern until a buyer could be found" necessitated a finding against clear and convincing evidence of intent not to resume use. Id.

We also find that the bureaucratic requirements and political considerations surrounding the acquisition and inter-government transfers of the Mustang Ranch property caution against a finding of clear and convincing evidence of intent not to resume use. While Ambient has produced newspaper articles purporting to represent the beliefs of some government officials that the property would never be used as a brothel, Ambient has not presented admissible evidence of an intent that could be attributed to the Government as a whole that the mark and the buildings could not be used as a brothel by another entity. See De La Cruz v. Dufresne, 533 F. Supp. 145, 149 (D. Nev. 1982) (newspaper articles are inadmissible pursuant to the hearsay rule). However, CPS has offered deposition testimony of the Government's time-consuming efforts to assess the value and uses of the property, as well as its one failed and one successful effort to sell the buildings along with the mark to a party that could use those assets for brothel services.[5] Thus we find a genuine issue of material fact as to whether the Government intended use of the mark to resume within a reasonable period of time.

---

[5] At a minimum, there is a factual dispute regarding whether the trademark was inadvertently left out of the first auction attempt. (See Struble Depo. at 47-49; Brandt Depo. at 66-67.)

13

Furthermore, CPS has provided ample evidence that it always intended to use the mark for a brothel. Its advertising the brothel since October of 2003, coupled with the complications of obtaining and moving the brothel assets to a new location (Gilman Depo. at 23-25), provides evidence of both intent to resume use and valid reasons for nonuse in the relatively short period of time CPS has had an interest in the mark.[6]

Thus, when the facts are viewed in the light most favorable to the non-moving party, CPS, the four-year period of nonuse was likely caused by a slow-moving bureaucracy's attempts to obtain control over and assess its newly acquired assets, determine what it could and could not use, transfer the useful portions to the appropriate government agency, and ultimately sell the mark and its goodwill to a party who did intend to use the mark for brothel services as soon as it was able to relocate the property. As such, Ambient has not proved abandonment as a matter of law.

---

[6] Furthermore, we note that considerable goodwill remains in the "world famous" Mustang Ranch mark. BLM attorney Alf Brandt testified that seemingly valueless items, such as the health inspection certificate for the brothel's hot tub, sold for hundreds of dollars in the Government auctions. In addition, the numerous entities that have attempted to use the trademark and litigate for their rights in the mark testify to the exceptional goodwill associated with the Mustang Ranch brothel. While a finding of intact goodwill is not an absolute prerequisite for defeating charges of abandonment, Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 632 (1927), it has been a factor of consideration for some courts, see e.g. Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2nd Cir. 1980); EH Yacht LLC, 84 F. Supp. 2d at 566.

**IT IS, THEREFORE, HEREBY ORDERED** that, as addressed above, Defendant's Motion for Summary Judgment (#23) is **DENIED**. Genuine issues of material fact exist regarding the Government's alleged abandonment of the Mustang Ranch trademark.

DATED: This __22nd__ day of February, 2006.

_____
UNITED STATES DISTRICT JUDGE

15